UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FREEDOM MEDICAL, INC.,

      Plaintiff,

v.                                                                    Case No. 6:20-cv-771-Orl-37GJK

MAHESHWAR SEWPERSAUD; and
USINE ROTEC, INC.,

      Defendants.

_____

## ORDER

The Court ordered Defendants Maheshwar Sewpersaud ("**Sewpersaud**") and

Usine Rotec, Inc. ("**Rotec**") to show cause why they should not be held in civil contempt

for violating the Court's orders. (Doc. 149.) The Court held a hearing on the matter.[1] (Doc.

157.) On review, the Court holds Defendants in civil contempt.

## I.   BACKGROUND[2]

Plaintiff Freedom Medical, Inc. ("**Freedom**") rents and sells medical equipment to

hospitals, nursing homes, and other healthcare providers. (Doc. 1, ¶ 9.) Shortly after

_____

[1] After the hearing, the Court directed the parties to meet and confer on objections
to any exhibits presented. (*See* Doc. 158.) After prompting, Freedom then filed a number
of notices that still failed to fully comply with the Court's orders, but that did present the
exhibits and objections. (Docs. 159–162.) To the extent there are any objections to
referenced exhibits in this Order, the Court overrules them and admits the exhibits. And
the Court will discharge its November 2, 2020 order to show cause in light of Freedom's
response. (*Id.*)

[2] More details on the facts of this case can be found in the Court's Preliminary
Injunction Order. (Doc. 73.)

Sewpersaud left his job as branch manager of Freedom's Orlando Office to work for 3M on November 8, 2019, something seemed amiss to Freedom. (*See id.* ¶¶ 16, 36–37; Doc. 1-6; Doc. 61-4, ¶ 26.) A large bed sale to the Orlando VA that Sewpersaud had been working on, one that Sewpersaud had repeatedly assured Freedom was a done deal, never materialized. (Doc. 61-4, ¶¶ 19, 23, 27–28, pp. 17, 20.) So Freedom reached out to the Orlando VA to ask about the bed sale only to find the contract had been awarded to one of their competitor's, Interior Fusion. (*Id.* ¶¶ 28–31.) With that revelation, Sewpersaud's house of cards tumbled.

After investigating, Freedom learned Sewpersaud hadn't just been concealing the loss of the Orlando VA contract from Freedom—he had been actively assisting Interior Fusion in obtaining the bid while sabotaging Freedom's bid. (Doc. 115-4, pp. 51–87; *see also* Doc. 56-2, pp. 21–22; Doc. 61-4, pp. 66–67.) All while outwardly working for Freedom. (*See* Doc. 1-6.) Sewpersaud's reason for departure was also a lie. He wasn't going to work for 3M—he was going to work for another one of Freedom's competitors, medical bed manufacturer Rotec. (Doc. 56-1, ¶ 28; Doc. 61-4, ¶ 26) And the timing of his new job wasn't a coincidence—Rotec was supplying beds to Interior Fusion for the Orlando VA contract, and Sewpersaud helped coordinate the whole thing. (*See* Doc. 115-4, pp. 51–87.) Increasingly concerned about the misappropriation of its trade secrets, Freedom sued Sewpersaud and sought an injunction enforcing the restrictive covenant in Sewpersaud's employment agreement. (Docs. 1, 2; Doc. 1-1 ("**Agreement**").) The Agreement says:

> [Y]ou will not, during the term of your employment and for a period of one (1) year after the termination of your employment . . . (i) engage in any

business or perform any service . . . in competition with, similar to or the same as the business of [Freedom] [or] (ii) solicit, aid in the solicitation, or service in any way . . . any current or prospective client, customer or account, who has been solicited or serviced by [Freedom] within one (1) year prior to the termination of your employment.

[You] will not, during the term of your employment . . . for your own account or for the benefit of any person, solicit, divert or induce any of Freedom Medical Inc's customers, employees or consultants to leave the engagement of Freedom Medical, Inc.

(Doc. 1, ¶¶ 17–19; Doc. 1-1, p. 3.)

After reviewing Freedom's evidence, the Court entered a Temporary Restraining Order ("**TRO**"), on May 6, 2020, enjoining Sewpersaud from "[s]oliciting, doing business with, selling to, renting to, or servicing any current or prospective client, customer, or account, who has been solicited or served by Freedom Medical . . . within one (1) year prior to the termination of his employment." (Doc. 11, p. 11.) The TRO also required Sewpersaud to "preserve all documents and information in whatever form it exists relevant to the claims in the Verified Complaint (Doc. 1) including . . . communications . . . relating to Rotec, KAP Medical, or Interior Fusion." (*Id.* at 11–12.)

The Court then held a hearing on the matter. (Doc. 69.) At the hearing, the Court made clear to Sewpersaud's counsel, in Sewpersaud's presence, that "he needs to understand that it's critical that [relevant information on his electronic devices] be retained and that he'll need to make those devices available for some reasonable period of time." (Doc. 84, pp. 122:24–123:1.) The Court then converted the TRO into a preliminary injunction ("**PI**") on June 23, 2020. (Doc. 73.)

In the PI, the Court found the Agreement was necessary to protect Freedom's

confidential information and legitimate business interests, as required by Florida law. (*See id.* at 10–11.) And the Agreement reasonably prohibited Sewpersaud from disclosing confidential information and soliciting Freedom's current and prospective customers, as Sewpersaud conceded. (*Id.* at 12.) While the Agreement was limited in time to one year, the restrictive covenant in the Agreement, which prohibited Sewpersaud from working in any capacity for a competitor, contained no geographic limitation. (*See id.*) So the Court found it reasonable to restrict the geographic scope of the non-compete agreement to Sewpersaud's former sales territory since, at the time, Freedom failed to present evidence a global injunction was appropriate. (*Id.* at 11.) Sewpersaud was again enjoined from "[s]oliciting, doing business with, selling to, renting to, or servicing any current or prospective" customer of Freedom's but he was permitted to continue working for Rotec, provided he performed no work for Rotec "in any capacity in his former Freedom [] Sales Territory." (*Id.* at 16–17.)

Two months later, Freedom moved for an order to show cause arguing Sewpersaud, acting in concert with Rotec, violated the TRO and PI. (Doc. 115 ("**Show Cause Motion**").) Freedom also moved for the approval of lists detailing the current and prospective customers of Freedom that Sewpersaud was enjoined from servicing under the PI ("**Customer Lists**").[3] (Doc. 95 ("**Customer List Motion**").) Both Sewpersaud and Rotec responded to the motions, but before the Court could hold a hearing, Sewpersaud

---

[3] The Court had directed the parties to confer on creating these lists, but the parties were unable to reach an agreement. (Doc. 73, p. 16; Doc. 120.)

filed for bankruptcy. (Docs. 106, 121–22, 134.) After briefing, the Court reset the show cause hearing for October 27, 2020 and clarified that, while the case would be stayed as to Sewpersaud generally, the Court would continue to exercise its injunctive powers to ensure that all parties—Sewpersaud included—obeyed this Court's orders. (Doc. 149.)

After a hearing and briefing (Docs. 115, 121, 122, 157), these matters are ripe.

## II.   LEGAL STANDARDS

A party seeking civil contempt must show by "clear and convincing evidence that the alleged contemnor has violated an outstanding court order." *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (citations omitted). The burden then shifts to the alleged contemnor, who can "defend his failure on the grounds that he was unable to comply." *Id.* Upon a proper defense, the burden shifts back to the party seeking contempt to show "ability to comply." *Id.*

If a district court holds a person in civil contempt, it has "wide discretion to fashion an equitable remedy . . . that is appropriate to the circumstances." *E.E.O.C. v. Guardian Pools, Inc.*, 828 F.2d 1507, 1515 (11th Cir. 1987). Options include coercive and compensatory sanctions. *Citronelle-Mobile Gathering v. Watkins*, 943 F.2d 1297, 1304 (11th Cir. 1991). Courts should consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Guardian Pools, Inc.*, 828 F.2d at 1515 (quotation marks and citation omitted).

### III.   ANALYSIS

This case comes down to trust. Namely, how Defendants are no longer entitled to it. Let's dive in.

#### A.   Sewpersaud's Violations

Before Sewpersaud was violating Court orders, he was violating the duty of loyalty to his employer, Freedom. Emails show that in September 2019, several months before resigning from Freedom, Sewpersaud was emailing employees at Interior Fusion and Rotec, helping coordinate the necessary authorizations for Interior Fusion to submit its bid to the Orlando VA. (*See* Doc. 115-4, pp. 51–87.) At the same time, Sewpersaud neglected to follow up on emails from the Orlando VA asking about Freedom's bid. (*See* Doc. 56-2, pp. 21–22; Doc. 61-4, pp. 66–67.) On September 24, 2019 Sewpersaud emailed Richard Fendley of Interior Fusion, telling him to send Richard Hains, of Rotec, the purchase order for the beds today. (Doc. 115-12.) Later that day, Mr. Fendley emailed Mr. Hains with a purchase order for 1100 beds for the Orlando VA, cheering their new relationship. (*Id.*) Sewpersaud had betrayed Freedom's trust. And past is prologue.

By the entry of the TRO, on May 6, the Court *should* have stopped most of Sewpersaud's harmful conduct that breached Freedom's rights. (*See* Doc. 11.) The TRO enjoined Sewpersaud from "doing business with, . . . or servicing any current . . . client" of Freedom. (*Id.* at 11.) But Sewpersaud disregarded the TRO, multiple times. Between May 6 to May 15, 2020, just days after the entry of the TRO, Sewpersaud emailed Edward Reyes, of the Orlando VA, on behalf of Rotec, arranging a time for Sewpersaud to drop

off hand controls for beds. (Doc. 115-5, p. 2.) The Orlando VA—whose bid triggered this case—is unquestionably a Freedom client, as Sewpersaud well knew. (*See* Doc. 1.) Sewpersaud also continued to work with the Coatesville VA to service their Rotec beds. (Doc. 115-6.) The Coatesville VA is another Freedom customer.[4] (Doc. 96-9, ¶ 7, p. 19.)

And the PI didn't stop Sewpersaud either. In the weeks leading up to the entry of the PI, Sewpersaud emailed another Freedom customer, Select Hospital in Panama City ("**Select PC**"), arranging to do "in-servicing" for Rotec's beds at the hospital. (Doc. 115-7.) On July 8, 2020, after the PI had been entered, Sewpersaud traveled to Select PC and provided in-servicing on behalf of Rotec.[5] (*See id*.) "Servicing" Freedom's customers is explicitly prohibited by the PI. (Doc. 73, p. 16.) Like with the Orlando VA and the Coatesville VA, Select PC is a Freedom customer—something Sewpersaud knew. (Doc. 96-9, ¶ 19; Doc. 104-1; Doc. 115-10, pp. 154:12–155:1; Doc. 161-1, pp. 272–74, 352–56; *see also* Doc. 115-2, p. 3.)

And these are only the times Sewpersaud was caught—a number likely reduced by the steps Sewpersaud has taken to conceal his conduct. With the TRO, the Court

---

[4] For civil contempt, Freedom is not required to show these violations of the TRO were willful. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). But it is worth noting that, as a Veterans Administration facility, at a minimum Sewpersaud should have been on notice of the strong likelihood this was a forbidden contact and yet neither he nor Rotec took any steps to better inform themselves, even believing his testimony at the hearing that he wasn't aware the Coatesville VA was a customer. (*See* Doc. 157; *see also* Doc. 122, p. 8.)

[5] For "in-servicing" Sewpersaud demonstrates the product and shows how it works; it occurs in connection with the delivery of the product or to customers before buying a product. (Doc. 132-2, p. 10:17–24.)

directed Sewpersaud to cooperate in the inspection of his electronic devices and to preserve relevant data and communications—an instruction the Court reiterated at the hearing on the PI. (Doc. 11, pp. 11–12; Doc. 84, pp. 122:24–123:1.) But a second inspection of Sewpersaud's cell phones and computers on July 10, 2020 showed over 100,000 text messages had been deleted from his phone, compared to an earlier inspection on May 9, 2020. (Doc. 115-4, ¶¶ 9–10, 12, 18.) Sewpersaud deleted these messages by changing the message retention setting on his iPhone—a change he made 38 minutes before turning over his phone for inspection. (*Id.* ¶ 21.) And there is evidence Sewpersaud deleted emails between himself and Rotec and deleted his WhatsApp application with thousands of messages, again hiding communications that could have contained incriminating evidence. (*Id.* ¶¶ 23, 35.)

Sewpersaud's explanations for his actions are wholly unsatisfactory. First, he blames Freedom's insistence on keepings its customer lists designated attorneys-eyes-only for his servicing of Freedom's customers, claiming he couldn't have known he was violating the TRO and PI by soliciting or servicing the Orlando VA, the Coatesville VA, or Select PC. (Doc. 122, pp. 7–11.) But (1) violations don't need to be willful for a person to be held in civil contempt;[6] and (2) these arguments ignore the evidence, detailed above, that Sewpersaud *did* know (or should have known) these were Freedom customers. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). Freedom showed by clear and

---

[6] And there is no evidence Sewpersaud attempted to comply by reaching out to counsel or to Freedom to see if these were forbidden contacts.

convincing evidence Sewpersaud violated the TRO and PI, and Sewpersaud failed to show he was unable to comply with the Court's order—so civil contempt is appropriate. *See Wellington Precious Metals, Inc.*, 950 F.2d at 1529.

As to deleting to his emails and messages, Sewpersaud's testimony is inconsistent and not credible. Sewpersaud first testified under oath he changed his iPhone retention settings "before [he] was served"—but computer forensics show this change was made much later, on July 10, 2020, less than an hour before he was forced to turn over his device for a second inspection. (Doc. 115-4, ¶ 21; *cf.* Doc. 115-10, p. 199:5–8.) Next, in his deposition, he swore it was done to save space on his phone. (Doc. 115-10, p. 199:9–13.) But in his testimony before the Court at the show cause hearing, he swore, multiple times, he didn't recall changing the settings. (*See* Doc. 157.[7]) For his emails, Freedom conceded it could not precisely pinpoint when the emails were deleted—but that is in large part because Sewpersaud didn't provide password information to his email accounts at the first imaging, despite the Court, in the TRO, directing Sewpersaud to cooperate in the inspection of his electronics. (Doc. 61-6, ¶¶ 32–33; *cf.* Doc. 11, p. 12; *see also* Doc. 157.[8]) It was only after the Court specifically ordered Sewpersaud, at the PI hearing, to turn over his password that Freedom was able to fully inspect his emails and determine relevant messages had been deleted. (*See* Doc. 84, p. 121:9–15; Doc. 115-4, ¶ 35.) So Freedom has

---

[7] An official transcript of the hearing is not available as of this Order, but the Court summarizes relevant testimony.

[8] At the show cause hearing, Freedom represented to the Court that it "ha[s] no way of verifying when he deleted those emails. Because . . . before the first inspection, his counsel could not provide us with his email password."

shown by clear and convincing evidence Sewpersaud violated the TRO and the Court's oral preservation orders. And Sewpersaud hasn't shown impossibility. So Sewpersaud is held in civil contempt.

> ### B.    Rotec

Nor is Rotec an innocent bystander in this chicanery. Rotec can be held in civil contempt for violating the PI if Freedom shows Rotec (1) received "actual notice" of the PI; and (2) worked "in active concert or participation" with Sewpersaud. *See* Fed. R. Civ. P. 65(d). Freedom has met its burden.

On June 24, 2020 Freedom filed an amended complaint, adding Rotec as a defendant. (Doc. 75.) The next day, Freedom sent Rotec a letter, confirming it had been served with a copy of the amended complaint and PI. (Doc. 115-2 ("**Letter**").) In the Letter, Freedom stated: "Freedom [] is preparing a list of the entities to which [the PI] applies, . . . however, both Rotec and Mr. Sewpersaud are aware of certain such entities including, without limitation, Interior Fusion, the Orlando VA, [and] all Select hospitals." (Doc. 115-2.) This letter, and the Court's PI, were ignored.

On August 14, 2020, Richard Hains of Rotec received an email from an employee at New Source Medical, asking for help confirming a visit to a Select hospital in Orlando. (Doc. 161-1, pp. 379–80.) Mr. Hains forwarded the email to Sewpersaud, asking: "I know that you personally know Ashley at Select Orlando. . . . Can you please try to call her or go and see her Monday morning?" (*Id.*) Freedom couldn't produce a more smoking gun if it tried. Not only was Rotec asking Sewpersaud specifically to reach out to one of

Freedom's customers—but it was asking Sewpersaud to perform work on its behalf inside Sewpersaud's former sales territory. (*Id.*) The language of the PI is unequivocal: "Sewpersaud is **ENJOINED** from working for Rotec *in any capacity* in his former Freedom [] Sales Territory . . . ." (Doc. 73, p. 17 (emphasis added).) Rotec knew Sewpersaud wasn't permitted to work in Orlando—it chose to ignore the PI. (*See* Docs. 73, 115-2; *cf.* Doc. 161-1, pp. 379–80.)

And Sewpersaud's in-servicing of Select PC wasn't just Sewpersaud's violation—it was also Rotec's. The in-servicing occurred on July 8, 2020—well after Rotec had been informed of the PI and Freedom's national contract with Select hospitals. (Doc. 115-7, p. 1; *cf.* Doc. 115-2.) Yet despite language in the PI prohibiting Sewpersaud from servicing Freedom customers—which included Select PC—Rotec sent Sewpersaud to provide training.[9] (*See* Doc. 115-7.) So Freedom has shown, by clear and convincing evidence, Rotec violated the PI.

And Rotec has failed to show these violations can be excused. Rotec, too, blames the attorneys-eyes-only designations of the customer lists, and the later addition of Select PC to the list, but this ignores the Letter sent on June 25, 2020. (Doc. 121, pp. 12–13; *cf.* 115-2.) This argument also fails to address the Select Orlando request, directing Sewpersaud to violate the PI. (*See* Doc. 161-1, pp. 379–80.) So Rotec has not shown impossibility, and it is held in civil contempt.

---

[9] Not only did Sewpersaud travel to Select PC on Rotec's behalf, but Mr. Hains was cc'd on all the emails. (*See* Doc. 115-7.)

## C.      Remedy and Stay

The last question remaining, then, is what to do. Clearly this conduct cannot be permitted to continue. Fool me once, so they say.

First, the Court will modify its PI and enjoin Sewpersaud from working for Rotec in any capacity worldwide. When the Court first entered the PI, it exercised its authority under Florida Statue § 542.335 to limit the geographic scope of the covenant not to compete to Sewpersaud's former sales territory. (Doc. 73, p. 10.) The Court reasoned that Freedom hadn't presented evidence a global injunction was appropriate. (*See id.* at 11.)

Well, now Freedom has. Implicit in the Court's reasoning in the PI was that its orders would be obeyed and that concurrent prohibitions—enjoining Sewpersaud from doing business with Freedom customers—would adequately protect Freedom. (*See* Doc. 73.) But both Sewpersaud and Rotec have now definitively demonstrated that assumption was flawed and that no protection, short of a global injunction prohibiting Sewpersaud from working for Rotec, will reasonably protect Freedom's legitimate business interests in its confidential information and its customer relationships. *See supra,* Sections III.A, B; *see also Carnahan v. Alexander Proudfoot Co.,* 581 So. 2d 184, 186 (Fla. 4th DCA 1991); *Office Depot, Inc. v. Babb,* No. 20-cv-80407-SINGHAL, 2020 WL 1306984, at *3 (S.D. Fla. Mar. 19, 2020). So the Court extends the geographic scope of Sewpersaud's covenant not to compete.[10] And the Court will also extend the time of the PI, to one year from the date of the entry of this order, since its previous injunctions were disregarded

---

[10] This moots the need to approve customer lists.

by Defendants. *See Univ. Med. Clinics, Inc. v. Quality Health Plans, Inc.*, 51 So. 3d 1191, 1195 (Fla. 4th DCA 2011).

Next, the Court will impose monetary sanctions on Rotec. The costs, including attorneys' fees, of litigating the Show Cause Motion (Doc. 115) are taxed to Rotec. *See Tom James Co. v. Morgan*, 141 F. App'x 894, 899 (11th Cir. 2005). Since this Order resolves the Show Cause Motion with respect to Sewpersaud, the case is fully stayed as to Sewpersaud. (*See* Doc. 149, p. 4.) The stay will remain lifted as to Rotec only for the limited purpose of determining appropriate costs and fees. Once this issue is resolved, the Court will stay the case in its entirety. (*See id.*)

## IV.    CONCLUSION

It is **ORDERED AND ADJUDGED**:

1.    Defendant Maheshwar Sewpersaud is **HELD IN CIVIL CONTEMPT** for violating the Court's temporary restraining order (Doc. 11) and preliminary injunction (Doc. 73).

2.    Defendant Usine Rotec, Inc. is **HELD IN CIVIL CONTEMPT** for violating the Court's preliminary injunction (Doc. 73).

3.    Attorneys' fees and costs for litigating Plaintiff Freedom Medical's Motion for Order to Show Cause (Doc. 115), culminating in the entry of this Order, is **TAXED** to Defendant Usine Rotec, Inc. By Tuesday, **November 17, 2020**, Plaintiff may file a motion for fees and costs.

4.    The Court's preliminary injunction (Doc. 73) is **MODIFIED** as follows:

a.   Defendant Maheshwar Sewpersaud is **ENJOINED** from working for Defendant Usine Rotec, Inc. in any capacity, globally, for a period of one (1) year commencing from the entry of this Order;

b.   Sewpersaud is **DIRECTED** to preserve all documents and information in whatever form it exists relevant to the claims in the Amended Complaint (Doc. 75) including, without limitation, all property, data, software, files, and confidential information taken from or created for or by Freedom, including its agents, representatives, and employees, as well as all communications, text messages, emails, documents, and data related to the claims in the Amended Complaint;

c.   Defendant Usine Rotec, Inc. is **ENJOINED** from working in concert with Sewpersaud in any capacity in violation of this Order or the preliminary injunction (Doc. 73);

d.   In all other respects, the preliminary injunction remains unchanged.

5.   Plaintiff's Motion for Approval of Customer List and Prospective Customer List (Doc. 95) is **DENIED AS MOOT.**

6.   The Clerk is **DIRECTED** to terminate as a pending motion the Report and Recommendation on Plaintiff's Motion for Approval of Customers Lists (Doc. 129) as moot.

7.   The case is fully **STAYED** as to Defendant Maheshwar Sewpersaud. (*See*

Doc. 136.) The stay remains **LIFTED** as to Defendant Usine Rotec, Inc. and Plaintiff Freedom Medical, Inc. for the limited purpose of resolving attorneys' fees and costs only.

8. The Court's November 2, 2020 Order to Show Cause (Doc. 159) is **DISCHARGED.**

**DONE AND ORDERED** in Chambers in Orlando, Florida, on November 3, 2020.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record
Maheshwar Sewpersaud

-15-